**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Denise B. Perkowski, | : | Case No. 3:07CV2956 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION** <u>**AND ORDER**</u> |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are issues arising from the Briefs of the parties and Plaintiff's Reply (Docket Nos. 19, 22 and 25). For the reasons set forth below, the Commissioner's decision is affirmed.

**<u>PROCEDURAL BACKGROUND</u>**

Plaintiff filed applications for Title II DIB and Title XVI SSI on September 26, 2003, alleging that she had been disabled since January 1, 2000 (Tr. 51-53). The applications were denied initially and upon

reconsideration (Tr. 31-33, 27-29). Plaintiff requested an administrative hearing, and on March 8, 2006, Administrative Law Judge (ALJ) Bryan J. Bernstein conducted a hearing at which Plaintiff, represented by counsel and Vocational Expert (VE) Joseph Havranek appeared and testified. The ALJ issued an unfavorable decision on December 28, 2006 (Tr. 13-22). The Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the Commissioner's final decision (Tr. 4-6).

## FACTUAL BACKGROUND

*The Plaintiff's Testimony*

In 2003, Plaintiff was employed as a part-time bakery clerk (Tr. 291). In that capacity, she served ice cream and popcorn and she stocked the shelves with bread (Tr. 292). She stopped working as a bakery clerk once she started having panic attacks. It was difficult to leave her station when she was overcome with vomiting, sweating, the shakes, fever and general nausea (Tr. 293). She had difficulty concentrating or dealing with co-workers (Tr. 294-295). Plaintiff suffered from vertigo and she occasionally collapsed after an episode (Tr. 295).

Prior to taking a sleep aid and an antidepressant, Plaintiff was suicidal and depressed (Tr. 294). The medication assisted her with issues of self loathing and allowed her to address obsessive and compulsive behaviors such as picking and scratching her face, arms and legs (Tr. 296, 297). The panic attacks were less frequent but she still had them once or twice weekly (Tr. 302). Exposure to people walking by or looking at Plaintiff precipitated the attacks (Tr. 303). She was easily distracted but she could also be obsessed simultaneously with the task at hand (Tr. 309). Despite frequent nightmares, Plaintiff was able to sleep from four to six hours after taking Zoloft and Seroquel (Tr. 306).

2

Plaintiff did not drive because she was too nervous and she had difficulty concentrating (Tr. 298). She was meticulous in her personal grooming and housekeeping (Tr. 300, 307, 308). She prepared simple meals for herself (Tr. 300). When she shopped for groceries, her brother who lived with her drove her to the store (Tr. 299-301).

*The VE's Testimony*

The VE assumed that if Plaintiff did not have to work in an environment that imposed a regimented pace of production, close and critical supervision, flexibility in structure or intense public contact, she could return to her past relevant work of a foreclosure technician or a programmer analyst (Tr. 312-313). In the alternative, there was other unskilled work that would accommodate Plaintiff such as floor waxer at the medium level of exertion, a laundry folder at the light level of exertion and microfilm document preparer at the sedentary level. There were 500 to 700 of the floor waxer positions in the region, 750-1,000 of the laundry folder positions in the region and approximately 500 of the microfilm document preparer positions in the region. The region was defined as all counties within a 75 mile radius, including north of Toledo, Ohio (Tr. 314). The positions were consistent with the descriptions of jobs in the DICTIONARY OF OCCUPATIONAL TITLES (Tr. 314-315).

On cross-examination, the VE omitted the job of programmer analyst from the list of available jobs if Plaintiff were required to deal with emergencies or interact with irate customers (Tr. 315-316). If she had panic attacks that interfered with her performance for prolonged periods or caused her to miss more than one day per month over and above the prescribed leave or other benefits for a prolonged period, especially in the unskilled jobs, she would be subject to discipline or discharge (Tr. 316, 318). If required to be off

3

task for five minutes per hour, the possible list of jobs available would be eliminated (Tr. 318).

## **MEDICAL EVIDENCE**

**1.     Dr. Susan Gross.**

Dr. Gross began treating Plaintiff for migraine headaches in December 1999 (Tr. 160). She also administered a traditional vaccine on December 3, 1999 (Tr. 164). On January 8, 2000, Plaintiff was treated for asthma/allergies (Tr. 156). The screens for autoimmune disorders were normal when administered on January 10, 2000 (Tr. 159). On January 14, 2000, Dr. Gross noted that Plaintiff's breathing had improved (Tr. 155). Plaintiff was treated for diarrhea on January 20, 2000 (Tr. 154).

On September 25, 2002, and February 20, 2003, Dr. Gross opined that Plaintiff had a chronic medical condition known as anxiety disorder or depression. Based on the definition, Dr. Gross described Plaintiff as a medication dependent person (Tr. 263, 264).

On January 3, February 14, March 13, April 18, and May 9, 2002, Plaintiff was treated for recurrent sinusitis (Tr. 149 - 153). Dr. Gross noticed the presence of anxiety on May 9, 2002 (Tr. 149). In June 2002, Plaintiff was prescribed an antidepressant (Tr. 148).

On February 6, 2003, Dr. Gross noted that Plaintiff's anxiety was "better on" the antidepressant (Tr. 147). Dr. Gross increased the dosage on March 27, 2003 (Tr. 146).

**2.     Psychologist J. Bruce Kelly**.

Plaintiff underwent a psychological examination on December 30, 2003, during which the Mini-Mental State Examination (MMSE) and the Wide Range Achievement Test (WRAT) were administered (Tr. 171, 172). The results of the MMSE showed no evidence of cognitive impairment (Tr. 172). The results

of the WRAT demonstrated that Plaintiff's reading level was on the post high school level. Cognitive functioning information gathered suggested that Plaintiff was functioning in the range of average intellectual functioning (Tr. 172).

Ultimately, Mr. Kelly diagnosed Plaintiff with anxiety and personality disorders, migraines, occupational, economic and social problems and some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (Tr. 173). Mr. Kelly opined that Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activity was mildly impaired (Tr. 174).

**3.      Medical College of Ohio (MCO).**

Garrett Synder, a medical student, evaluated Plaintiff on August 4, 2003, and found that Plaintiff's depressive episodes were indicative of recurrent major depressive disorder, dysthymia, obsessive compulsive disorder, panic disorder and a disorder characterized by an appetite for dirt (Tr. 187). He also noted that Plaintiff had occupational, economic and social problems and some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (Tr. 188). The results of Plaintiff's blood chemistry and thyroid function tests were normal on September 17, 2003 (Tr. 166).

Plaintiff presented to the MCO Department of Psychiatry for comprehensive medication/somatic service (Tr. 209). On September 17 and October 8, 2003, Plaintiff reported that she had suicidal ideations daily; however, she was getting out of the house more and there was some notable decrease in her compulsive behaviors (Tr. 209, 210, 211). She reported on October 29, 2003, that thoughts of suicide were

not present (Tr. 214). By December 3, 2003, Plaintiff noted some improvement in her ability to control obsessions and compulsions as a result of the medication. Although she was in a depressed mood, she had ventured outside of her home more (Tr. 216, 217). Again, Plaintiff showed some signs of improvement when examined on December 15 and December 26, 2003 (Tr. 218, 220). Plaintiff exhibited some self confidence and self respect when she presented to the session on December 29, 2003 (Tr. 221). There was some improvement in her obsessive/compulsive behaviors. The overall level and frequency of anxieties were reduced (Tr. 222).

On October 8, 2003, Dr. Monica S. Smith, a psychiatric resident under the supervision of Dr. Kristi Skeel Williams, opined that Plaintiff had marked limitations in her ability to complete a normal work week without interruption, interact with the public, set realistic goals or make plans independently. Plaintiff's ability to perform activities within a schedule, maintain regular attendance and be punctual was extremely limited (Tr. 266). Overall, Plaintiff's obsessive compulsive behaviors interfered with her ability to function normally on a daily basis (Tr. 267).

On January 9, 2004, Drs. Smith and Skeel Williams conducted a diagnostic examination after which they diagnosed Plaintiff with depressive episodes indicative of a major depressive disorder, recurrent and severe, in partial remission, dysthymia, obsessive/compulsive behavior, panic disorder, insectophobia and an appetite for dirt. They further found that Plaintiff had occupational, economical and social problems and some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. Continued cognitive behavioral therapy was recommended to address symptoms of anxiety, obsessions and compulsions (Tr. 177, 178).

Plaintiff continued to make some improvement until March 24, 2004, when Plaintiff claimed she "ran out" of her mood stabilizing medication and began to engage in compulsive acts (Tr. 231). "Flashes" of suicide resurfaced (Tr. 235). However, by April 21, 2004, Plaintiff had reintroduced the mood stabilizing medication into her drug therapy and she was making some improvement (Tr. 234). When Plaintiff returned for care in June, she was having some difficulty with moving to a new neighborhood with "too many people" (Tr. 238, 239). Her obsessive/compulsive disorder revolved around cleanliness.

Plaintiff's therapy was continued in July 2004 as she continued to feel "pretty low" and entertain suicidal thoughts (Tr. 242, 243). In late July 2004, Plaintiff had a panic attack and she still had suicidal thoughts (Tr. 245). She denied having suicidal thoughts on August 13, 2004 (Tr. 246). On October 25, 2004, she reported that her mood was depressed and she was sleeping less (Tr. 250). She had fewer thoughts of suicide (Tr. 251).

Plaintiff's mood was still depressed in November 2004 (Tr. 252, 253). Her prescriptions were refilled in December 2004 (Tr. 256). The dosages of the mood stabilizing drugs were increased (Tr. 258). At December's end, Plaintiff was having suicidal thoughts on alternate days (Tr. 259).

**4.     Mental Functional Capacity Assessment.**

Dr. Lubna Izzathullah, a psychiatrist, opined on February 28, 2005, that Plaintiff was extremely limited in her ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public and travel in unfamiliar places or use public transportation (Tr. 271). Dr. Izzathullah concurred in the diagnoses of dysthymia and obsessive/compulsive disorders. In her opinion, Plaintiff's impairments would last for more than twelve months and that after performing the

relevant physical examination, Plaintiff was unemployable (Tr. 272). She concurred with Dr. Gross that Plaintiff was a medically dependent person (Tr. 273).

5.      **Mental Residual Functional Capacity Assessment**.

Dr. Cynthia Nickless, Ph. D., concluded on January 21, 2004, that Plaintiff's impairments resulted in moderate limitations to her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular and punctual attendance, complete a normal work week without interruption for psychologically based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism, get along with co-workers and set realistic goals or make plans independently of others (Tr. 204).

6.      **Psychiatric Review Technique.**

Also on January 21, 2004, Dr. Nickless concluded that Plaintiff's anxiety disorder was a medically determinable impairment (Tr. 195). Plaintiff had mild functional limitations in her ability to engage in activities of daily living, moderate difficulties in social functioning, mild degrees of functional limitations in maintaining concentration, persistence or pace (Tr. 200).

7.      **Dr. John A. Winder.**

In November 1999, Plaintiff was evaluated and prescribed an inhaler. Consideration was given to making a referral to an ear/nose/throat professional to straighten the nasal septum (Tr. 161).

## **STANDARD FOR DISABILITY**

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined

as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *[Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir.1990)]. *Id.*

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding
of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

Fifth, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F. 3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).

If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## **ALJ DETERMINATIONS**

After consideration of the entire record, the ALJ made the following findings:

9

1. Plaintiff met the insured status requirements of the Act through March 31, 2006.

2. Plaintiff had not engaged in substantial gainful activity since January 1, 2000, the alleged onset date.

3. Plaintiff had severe mental impairments; however, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4. Plaintiff had a limited residual functional capacity and she was able to perform her past relevant work as a program analyst and a system specialist as those jobs are performed in the national economy.

5. Plaintiff, a younger individual with a high-school education and the ability to communicate in English, could also perform the requirements of occupations such as floor waxer, laundry folder and microfilm document preparer.

7. Plaintiff was not under a disability as defined in the Act from January 1, 2000, through the date of the decision or December 28, 2006.

(Tr. 13-22).

## **STANDARD OF REVIEW**

This Court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). In reviewing claims under the Act, a district court does not review the matter *de novo. Id.* Instead, a district court is limited to examining the entire administrative record to determine whether the Commissioner's final decision is supported by *substantial evidence. Brown v. Commissioner of Social Security,* 2007 WL 4556678, *5 (N.D.Ohio 2007) (*citing Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984); 5 U.S.C. § 706(2)(E); 42 U.S.C. § 405(g)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* To determine whether substantial evidence exists to support the

10

Commissioner's decision, a district court must not focus, or base its decision, on a single piece of evidence. Rather, a court must consider the totality of the evidence on record. *Id.* (*citing Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews,* 574 F.2d 359 (6th Cir. 1978)).

When dealing with conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.* at *6. To that end, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id*. (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, for this Court to accept the ALJ's conclusions, it must only find that they are based on substantial evidence. *Id.*

## DISCUSSION

**1.  DID THE ALJ ERR, AS A MATTER OF LAW, IN HIS ANALYSIS OF THE TREATING PSYCHIATRISTS?**

Plaintiff claims that the ALJ failed to accord the proper evidentiary weight to her treating psychiatrist's opinions.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security,* 502 F.3d 532, 540 (6th Cir. 2007) (*see Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-530 (6th Cir. 1997) (*citing* 20 C.F.R. § 404.1527(d)(2) (1997)). A physician is considered a treating source if the claimant sees the physician with a frequency that is consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. *Id*. at 540 (alteration in original) (*quoting* 20 C.F.R. § 404.1502). A treating physician's statement that a

claimant is disabled is of course not determinative of the ultimate issue. *Farmer v. Astrue,* 2008 WL 343254, 6 (S. D. Ohio 2008) (*citing Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986)). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Id.* (*citing Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994)).

If the opinion of a treating source is not accorded controlling weight, an ALJ must apply a host of factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion. *Wilson v. Commissioner of Social Security,* 378 F. 3d 541, 544 (6th Cir. 2004) (*citing* 20 C. F. R. § 404.1527(d)(2)). In sum, to apply the correct legal standards, the ALJ's decision to reject the treating physician's opinion must be based on good and specific reasons why the treating physician rule is inapplicable. *Id.*

The ALJ considered Drs. Izzathullah and Smith as treating psychiatrists. He even conducted a comprehensive review of the nature and extent of the treatment relationship, and their specializations (Tr. 18-19. When he considered the supportability of the treating psychiatrist's opinions, neither passed muster. As a resident, Dr. Smith treated Plaintiff until she completed her rotation at MCO. During the course of treating Plaintiff, Dr. Smith did not perform any clinical or laboratory techniques. She assessed Plaintiff's progress based on her complaints and responses to Dr. Smith's inquiry. The ALJ found that her plans were

12

often not consistent with the somatic service. For instance, Plaintiff's condition improved under Dr. Smith's care. She was able to decrease the frequency of her thoughts of suicide (Tr. 214, 217, 219, 221, 223, 225, 227, 229, 232) and she learned how to control obsession and compulsions provided she took the medication as prescribed (Tr. 210, 216, 222). Generally her affect was appropriate to content, her thought content and process were intact, her memory was intact and her orientation was intact (Tr. 210, 213 216, 218, 220, 222, 224, 226, 228, 231, 234). The ALJ was not compelled to give substantial weight to the opinions of Dr. Smith that Plaintiff suffered severe impairments when her source statements and/or conclusions were inconsistent with her own clinical findings.

In diminishing the weight attributed to the opinions of Dr. Izzathullah, the ALJ noted that Dr. Izzathullah succeeded Dr. Smith in assuming Plaintiff's somatic care. Dr. Izzathullah did not conduct any medically acceptable clinical and laboratory techniques during the course of care. She simply continued the path of care commenced by Dr. Smith. She based her clinical observations on Plaintiff's responses. Dr. Izzathullah intervened with increased dosages of mood altering drugs when Plaintiff complained of life stressors, depression or hallucinations (Tr. 242-243, 250-253, 257-258). Also, during the course of treatment, some of Plaintiff's symptoms became less aggressive. The observations in the record do not suggest that Plaintiff had marked or extreme limitations. However, Dr. Izzathullah found that Plaintiff did have marked or extreme limitations that made her unemployable. The ALJ attributed less weight to Dr. Izzathullah's opinion that Plaintiff was disabled because it was not consistent with the ongoing treatment record.

The ALJ applied the treating physician rule, applied the legal factors of specialization, supportability

and consistency, and conducted meaningful review of the opinions of Drs. Smith and Izzathullah. The ALJ did not err in his decision to discount their opinions because substantial evidence supported his assessment. Considering that the rejection of the opinions of the treating psychiatrists is supported by good reasons, the Magistrate must defer to the ALJ's findings.

**2.** **DID THE ALJ ERR IN THE ASSESSMENT OF PLAINTIFF'S CREDIBILITY?**

Plaintiff contends that the ALJ's credibility determination is ambiguous because he found her credible and not credible simultaneously.

Key in this review is the premise that the ALJ, and not the reviewing court, evaluates the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 -248 (6th Cir. 2007) (*citing Walters, supra*, 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 538 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7P, 1996 WL 374186, * 4 (July 2, 1996). It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p, at *4. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. SSR 96-7p, at * 4. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the

14

entire case record." SSR 96-7p, at *4.

The record shows that the ALJ found that Plaintiff's testimony was sincere and detailed. He fully adopted her symptoms and impairments and included them in the residual functional capacity assessment. He empathized with Plaintiff's inability to return to her professional work. Overall, he found her testimony of her symptoms credible despite her "spotty" work history, her failure to keep several appointments or take prescribed medication. The ALJ has done exactly what he was required to do. He articulated his reasons for crediting and rejecting Plaintiff's complaints and how these factors were determinative in his credibility assessment. The Magistrate has no basis to disturb this finding.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Dated: 1/23/09